COPY

LYNN H. PASAHOW (CSB No. 054283)
J. DAVID HADDEN (CSB No. 176148)
DARREN E. DONNELLY (CSB No. 194335)
DAVID D. SCHUMANN (CSB No. 223936)
LAURIE CHARINGTON (CSB No. 229679)
FENWICK & WEST LLP
Silicon Valley Center, 801 California Street
Mountain View, CA 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

Attorneys for Plaintiff
Cryptography Research, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

C 04 4143 MEJ

| | |
|---|---|
| CRYPTOGRAPHY RESEARCH, INC.,<br>Plaintiff,<br>v.<br>VISA INTERNATIONAL SERVICES ASSOCIATION<br>Defendant. | Case No.<br>**COMPLAINT FOR BREACH OF CONTRACT, MISREPRESENTATION, AND PATENT INFRINGEMENT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Cryptography Research, Inc. ("CRI") for its Complaint against VISA International Services Association ("VISA") alleges the following:

## PARTIES

1. Plaintiff Cryptography Research, Inc. is a corporation duly organized and existing under the laws of California, and has its principal place of business at 575 Market Street, Suite 2150, San Francisco, California.

2. Defendant VISA International Services Association is a Delaware corporation with its principal place of business at 900 Metro Center Boulevard, Foster City, California.

\\\

\\\

## JURISDICTION

3. This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code. Therefore, this court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

## VENUE

4. Venue is proper in this district under 28 U.S.C. §§ 1391(c) and 1400(b).

## INTRADISTRICT ASSIGNMENT

5. This is a patent infringement action and, under Local Rule 3-2(c) and General Order 44 of this Court, venue is therefore proper in any courthouse in this district.

## GENERAL ALLEGATIONS

6. CRI is a leading innovator and developer of data security solutions. CRI develops and licenses solutions to both known data security threats, and those threats it discovers through its research activities. CRI is actively involved in areas including tamper resistance, content protection, network security, and financial services. Security hardware, software, and protocols designed by Cryptography Research engineers help protect billions of dollars of commerce annually.

7. Defendant VISA is a privately held membership association jointly owned by 21,000 financial institutions. Through its member financial institutions, VISA provides payment solutions to businesses and consumers using over one billion VISA-branded payment cards ("VISA Cards"). In 2003, over three trillion dollars in goods and services were purchased using VISA Cards. VISA derives revenue by collecting fees for transactions made with VISA Cards.

8. VISA evaluates and specifies various technologies for use in and with VISA Cards and products. VISA develops standards and specifications for use by VISA Card and system developers and manufacturers. Once adopted, VISA mandates compliance with VISA specifications before a card or service may carry the VISA brand. VISA performs in-house testing and evaluation and has developed a network of test labs to evaluate compliance with VISA mandated standards.

\\\

9. Among its products, VISA has developed and approved for use VISA Cards carrying embedded security microchips. These cards are also known as Smart Cards. VISA Smart Cards use cryptographic techniques and other security features to securely authenticate and authorize transactions in order to limit losses due to fraudulent transactions. Smart Cards thus offer significant security benefits over traditional magnetic-stripe payment cards.

10. CRI discovered serious security deficiencies affecting Smart Cards, including VISA Smart Cards. In particular, CRI discovered a technique known as differential power analysis ("DPA"), which allows an attacker to extract Smart Card keys, load or reset card balances, extract or reset card personal identification numbers ("PIN"), and emulate or clone Smart Cards. Thereafter, CRI invented countermeasures that can be implemented to protect a VISA Smart Card, or similar card, against DPA security flaws (the "DPA Resistance Inventions").

11. Beginning in or around October 1997, CRI confidentially informed VISA about the DPA security flaws in VISA Smart Cards. Subsequently, under a nondisclosure agreement, CRI disclosed to VISA various details of its DPA Resistance Inventions for protecting VISA Smart Cards against DPA attacks.

12. After evaluating CRI's DPA Resistance Inventions, on September 2, 1998, CRI and VISA entered into an Intellectual Property Rights License Agreement ("License Agreement") pursuant to which VISA International licensed the use of CRI's DPA Resistance Inventions for use in VISA Smart Cards. A copy of the License Agreement is attached as Exhibit A.

13. The License Agreement obligated VISA, in part, to pay $500,000, in four payments, for the first 500,000 Smart Cards issued bearing the VISA logo and using CRI's DPA Resistance Inventions, to pay per-card royalties ranging from $0.50 to $0.25 for each additional Smart Card issued bearing the VISA logo and using CRI's DPA Resistance Inventions between 500,001 and 5,000,000 cards, and to negotiate in good faith a royalty if during the life of the License Agreement more than 5,000,000 VISA Smart Cards issued bearing the VISA logo and using CRI's DPA Resistance Inventions. The License Agreement further required VISA, in part, to keep accurate records of the numbers of VISA Cards issued bearing the VISA logo and using

CRI's DPA Resistance Inventions, and to make quarterly written reports to CRI.

14. To induce CRI to enter into the License Agreement, on August 4, 1998, VISA represented to CRI, in writing, that through VISA's transaction clearance and settlement system, VISA had the ability to determine with high accuracy the number of VISA Smart Cards issued.

15. Pursuant to the terms of the License Agreement and related services agreements between VISA and CRI, and at VISA's request, CRI trained VISA employees, VISA vendors' employees, employees of Smart Card testing labs used by VISA, and employees of suppliers of VISA Smart Cards about CRI's then-confidential research on DPA, including CRI's DPA Resistance Inventions and their applicability to VISA Smart Cards, so that CRI's DPA Resistance Inventions could be incorporated into VISA Smart Cards. CRI also provided VISA with services to help VISA assess the susceptibility of VISA Smart Cards to DPA.

16. After CRI's confidential information about DPA security flaws in Smart Cards was leaked to the press, at VISA's request CRI assisted VISA in a subsequent public relations campaign to address the security issues and reassure holders and users of VISA Smart Cards.

17. Through amendments to its standards and specifications governing VISA Smart Cards, VISA mandated the use of one or more of CRI's DPA Resistance Inventions in VISA Smart Cards to overcome the DPA security flaws that previously existed in VISA Smart Cards. As a result, every VISA Smart Card produced to these requirements incorporates one or more of CRI's DPA Resistance Inventions.

18. VISA requires that VISA Smart Cards be tested to verify the presence of the DPA Resistance Inventions. VISA takes an active role in training and equipping its testing labs to perform these evaluations. Pursuant to VISA's request, CRI trained and equipped VISA authorized testing laboratories with capability to evaluate Smart Cards for security flaws and the effective implementation of CRI's DPA Resistance Inventions.

19. In January 1999, VISA's vice president, emerging technology, approved the following statement: "Cryptography Research's technology and assistance have played a major role in the ongoing success and protection of Visa's electronic payments systems."

\\\

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

20. In October 2001, CRI requested that VISA make a scheduled fixed payment, provide reports of VISA Cards issued and pay royalties pursuant to the terms of the License Agreement.

21. In an October 15, 2001 letter, VISA refused to make the fixed payment, provide reports or pay royalties under the Licensing Agreement. In order to avoid liability, VISA asserted that VISA did not issue Smart Cards containing CRI's technology, VISA was not involved in the proliferation of CRI's intellectual property, and VISA did not issue any sublicenses under the agreement. The letter falsely represented that VISA made no use of technology licensed under the License Agreement. VISA's letter also terminated the Licensing Agreement. While CRI was eventually able to obtain the required fixed payment from VISA, VISA failed to address the accounting report or royalty issues.

22. In a letter dated December 26, 2001, and contrary to the express written representations made to induce CRI to enter into the License Agreement, VISA represented to CRI that VISA had no way of determining the number of VISA-branded Smart Cards subject to the License Agreement. In particular, VISA stated, as an excuse for its failure to provide reports and to pay royalties as required by the License Agreement, that VISA has "no way to track" the use of CRI's technology in VISA Smart Cards. Under the License Agreement, VISA has a contractual obligation to keep "accurate records of the numbers of Licensed Cards subject to this agreement," where Licensed Cards is defined to include "any Issued Visa Branded Smart Cards containing Licensed Intellectual Property."

23. Notwithstanding VISA's termination of the License Agreement, VISA's standards and specifications governing VISA-branded Smart Cards continue to mandate that VISA Smart Cards employ DPA resistance, and thus require that every VISA Smart Card use one or more of CRI's DPA Resistance Inventions. Further, VISA mandates that VISA Smart Cards be tested before issuance to assure they achieve DPA resistance, and thus, VISA assures that every VISA Smart Card does include one or more of CRI's DPA Resistance Inventions.

\\\

\\\

## CLAIMS FOR RELIEF

### First Claim: Breach of Contract

24. CRI incorporates by reference Paragraphs 1 through 23 above as if fully set forth herein.

25. Defendant VISA has materially breached the License Agreement by, *inter alia*, failing and refusing to keep accurate records of the number of Smart Cards issued subject to the License Agreement as required by Section 3 of the License Agreement.

26. Defendant VISA has materially breached the License Agreement by, *inter alia*, failing and refusing to make quarterly written reports detailing the number of Smart Cards issued subject to the License Agreement as required by Section 3 of the License Agreement.

27. Defendant VISA has materially breached the License Agreement by, *inter alia*, failing and refusing to pay royalties owed under Section 3 of the License Agreement.

28. CRI has performed all the obligations required of it under the License Agreement.

29. Defendant VISA's breach has damaged CRI in the form of lost revenues from royalties, in an amount not yet ascertained and to be determined at trial.

### Second Claim: Misrepresentation

30. CRI incorporates by reference Paragraphs 1 through 23 above as if fully set forth herein.

31. CRI is informed and believes that VISA, with intent to cause CRI to license its intellectual property to VISA, falsely represented to CRI, intentionally, recklessly or negligently, that VISA's transaction clearance and settlement system accurately tracks the number of VISA Smart Cards issued and that VISA could therefore compute the royalties it would owe under the License Agreement with knowledge that VISA's system is not, in fact, capable of such tracking.

32. In justifiable reliance on VISA's misrepresentations, CRI entered into the License Agreement with VISA, and provided research, training, equipment, and assistance regarding the use and deployment of its intellectual property and provided authorization to use its intellectual property to VISA, VISA's vendors, and affiliated entities at VISA's direction. Had the true facts been known, CRI would not have entered into the License Agreement with VISA, and provided

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

research, training, equipment, assistance and authorization to use its intellectual property without reasonable and just consideration.

33. As a direct and proximate result of VISA's misrepresentation, CRI has suffered damages in an amount not yet ascertained and to be determined at trial.

34. By engaging in such actions, VISA is guilty of fraud, oppression, and other despicable conduct, thereby entitling CRI to exemplary and punitive damages.

**Third Claim: Patent Infringement Under 35 U.S.C. § 271**

35. CRI incorporates by reference Paragraphs 1 through 23 above as if fully set forth herein.

36. CRI is the owner by assignment of all right, title, and interest in and to United States Patent Nos. 6,298,442 B1 ("'442 Patent"), 6,304,658 B1 ("'658 Patent"), 6,654,884 B2 ("'884 Patent), 6,327,661 B1 ("'661 Patent"), 6,510,518 B1 ("'518 Patent") 6,381,699 B2 ("'699 Patent"), 6,278,783 ("'783 Patent"), and 6,539,092 ("'092 Patent") (collectively, "Countermeasure Patents") for securing cryptographic systems against external monitoring attacks. Copies of the Countermeasure Patents are attached to this Complaint as Exhibit B through I. CRI has been and still is the owner of the Countermeasure Patents, and the Countermeasure Patents are still in full force and effect.

37. The Countermeasure Patents claim the DPA Resistance Inventions, a collection of methods and systems for securing cryptographic systems, including VISA Smart Cards, against DPA attacks. To secure a Smart Card against a DPA attack, the system must use at least one of the DPA Resistance Inventions claimed in the Countermeasure Patents.

38. With full actual knowledge of CRI's patents, Defendant VISA has mandated the use of methods and systems for securing against external monitoring attacks on Smart Cards claimed in the Countermeasure Patents through its standards. VISA has also educated its employees, vendors, and test laboratory personnel in the use and detection of the technology claimed in the Countermeasure Patents. VISA has also directed its testing laboratories to verify that VISA-branded Smart Cards use the technology claimed in the Countermeasure Patents, in compliance with its standards, and equipped the testing laboratories to make these tests before

approving Smart Cards for use.

39. VISA-branded Smart Cards containing the technology claimed in at least the '661, '092, and '442 Patents are issued and used throughout the United States as well as globally. Infringement of other Countermeasure Patents will be determined through discovery.

40. Defendant VISA has willfully infringed and continues to willfully infringe one or more claims of the Countermeasure Patents. Unless enjoined by this Court, VISA will continue to infringe the Countermeasure Patents, and CRI has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law. Accordingly, CRI is entitled to preliminary and permanent injunctive relief against such infringement. As a result of VISA's willful infringement of the Countermeasure Patents, CRI has been and will be damaged, and is entitled to be compensated for treble such damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CRI prays for the following relief against Defendant VISA:

A. VISA be found to have willfully infringed the Countermeasure Patents.

B. An order that VISA account for and pay to CRI all proceeds made by VISA from its infringing acts, and that VISA make a complete and accurate account for and pay to CRI all damages resulting from VISA's infringing acts.

C. An order preliminarily and/or permanently enjoining VISA and its officers, agents, servants, and employees, and all persons in active concert or participation with them, from directly or otherwise infringing the Countermeasure Patents.

D. An order that VISA, its officers, agents, servants and employees, deliver to this Court or to CRI, for destruction, all products infringing on, directly or otherwise, the Countermeasure Patents or the use of which would infringe, directly or otherwise, the Countermeasure Patents.

E. An order that VISA provide a complete and accurate accounting of all VISA-branded Cards subject to the License Agreement and pay royalties to CRI as specified in the License Agreement.

F. CRI be awarded damages in an amount to be determined at trial.

\\\

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

G. CRI be awarded increased, treble, exemplary, and punitive damages for VISA's willful and malicious conduct.

H. An award of prejudgment interest, attorneys' fees, costs and such other and further relief as the Court may deem just and proper.

Dated: September 28, 2004

FENWICK & WEST LLP

By: ______________________
J. David Hadden

Attorneys for Plaintiff
CRYPTOGRAPHY RESEARCH, INC.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff Cryptography Research, Inc. demands a jury trial as to all matters triable of right by a jury.

Dated: September 28, 2004

FENWICK & WEST LLP

By: [signature]
J. David Hadden

Attorneys for Plaintiff
CRYPTOGRAPHY RESEARCH, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## CERTIFICATE OF INTERESTED ENTITIES OR PERSONS

Pursuant to Local Rule 3-16, the undersigned certifies that the following listed corporations have a financial and/or non-financial interest in the subject matter in controversy and/or in a party to this proceeding:

a) None

Dated: September 28, 2004

FENWICK & WEST LLP

By: [signature]
J. David Hadden

Attorneys for Plaintiff
CRYPTOGRAPHY RESEARCH, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW